FRED E. HUMMELL, TRUSTEE IN BANKRUPTCY OF THE ESTATE OF LESLIE HARRINGTON, BANKRUPT, *Appellant*, v. LESLIE HARRINGTON AND HIS WIFE, HARRIET HYER HARRINGTON, ET AL., *Appellees*.

Division B.

Opinion Filed June 29, 1926.

Petition for rehearing denied July 23, 1926.

1. The demurrer to the second amended Bill of Complaint admits all the material allegations well pleaded therein.

2. The allegations of the Bill with reference to the fraudulent intent, purposes and transactions of the bankrupt toward and with his creditors are pertinent for the purpose of showing the probability of fraud in the act of transferring a part of his estate to Mrs. Harrington for the alleged purpose of defrauding his creditors.

3.  A Trustee in Bankruptcy appointed under the provision of the Act of Congress to Establish a Uniform System of Bankruptcy is vested with full authority to maintain suits in equity to set aside fraudulent conveyances made by the bankrupt.

4.  In an action by a Trustee in Bankruptcy it will be presumed that his appointment is regular and that he has complied with all requirements of the Federal Statute and is qualified to act.

5.  The allegations of the bill to the effect that the Trustee had marshaled assets not exceeding in value the sum of $25,000.00 and that the claims filed and allowed amount to more than Eight Hundred Thousand Dollars are sufficient to constitute a basis upon which the trustee may proceed to recover property conveyed in fraud of creditors.

6.  In a contest between creditors of an insolvent debtor and the latter's wife over real estate purchases in her name during the husband's indebtedness, there must be clear proof that the purchase was made with the wife's separate funds, otherwise the presumption is that it was through means furnished by her husband.

7.  The Trustee is vested with all the rights, remedies, and powers of a judgment creditor of the bankrupt having an execution returned unsatisfied, and if a transfer be in fraud of creditors, he may set it aside, have the specific real property sold and apply the proceeds to the payments of the debts proved against the bankrupt.

8.  Where property is purchased by a debtor and the title is taken in the name of another to avoid creditors, the deed to the grantee for the property of the debtor can be set aside by then existing and by a subsequent creditor.

An Appeal from the Circuit Court for Palm Beach County; C. E. Chillingworth, Judge.

Reversed.

*Joanna Vermilye* and *Albert C. Fordham*, for Appellant;

*Kay, Adams, Ragland* and *Karz*, for Appellees.

BUFORD, J.—The complainant filed his bill in the Court below which, having been twice amended, sought to impress a trust upon certain real property in Palm Beach County, Florida, alleged to have been purchased by the wife of the bankrupt with funds of the bankrupt and taken in the name of the mother of the wife and to have the same marshaled as assets of the bankrupt. The following is a synopsis of the bill of complaint: Sets out the entities and abodes of the parties in this cause; that Fred E. Hummel was and still is a duly elected, qualified and acting trustee in bankruptcy of the estate of Leslie Harrington, bankrupt, still pending in the District Court of United States, Northern District of Illinois, Eastern Division, sitting at Chicago, Illinois. The appointment of the said Fred E. Hummel as trustee aforesaid grew out of a petition in bankruptcy filed against the said Leslie Harrington, bankrupt, on February 14th, A. D. 1922, and he was duly adjudicated a bankrupt by the said Court on the 7th day of April, 1922.

Complainant has obtained possession of property, amounting to about $24,116.17, and claims against the bankrupt estate are in aggregate $1,623,351.67 having been proved and duly allowed by the referee in bankruptcy and are now duly proven, allowed, existing and unpaid claims against said bankrupt estate. The said Leslie Harrington became indebted and said claims against his estate so proven and allowed arose in the following manner and not otherwise, to-wit:

Before the adjudication of Leslie Harrington as a bankrupt, particularly during 1920, 1921 and the first part of 1922, Harrington was engaged in promoting various

alleged business concerns and selling stock and other alleged securities. During 1921 he obtained a certain tract of land for an alleged consideration of One Hundred Thousand Dollars of which $25,000.00 was in cash and $75,000.00 was in stock of United States Novaculite Company, a corporation organized by Leslie Harrington, and in January, 1921, the said Harrington organized the American Novaculite Company. Each of these corporations had an alleged capital stock of Five Million Dollars, and the tract of land hereinbefore mentioned was the only asset of either and both of said corporations, the value of which did not exceed One Thousand Dollars.

On October 3rd, 1921, Leslie Harrington and Harriet Hyer Harrington, as husband and wife, executed a warranty deed conveying the said lands to the United States Novaculite Company; neither of said corporations ever functioned and the stock of said companies had no market value at any time, was worthless, and was owned solely by Leslie Harrington, the bankrupt, who was otherwise without assets and insolvent.

About September, 1920, the said Leslie Harrington promoted a fraudulent scheme whereby he would and did pretend to borrow money in sums of One Hundred Dollars and upwards upon his representation that he could invest that money in stocks, bonds, real estate and other such investments and gain great profits and repay in short terms of from thirty days to six months, not over one year, with profit to the investors ranging from 25 to 100 per cent. In addition thereto he promised to pay an additional interest upon the total principal and interest at the rate of six per cent per annum. He employed agents, Lithuanians, Poles, Slavs, etc., to solicit such investments and paid them a commission from two to three dollars per hundred dollars of the money that they brought in to him.

The said Leslie Harrington required all investments to

be in cash and called his plan 'Specials' or 'Special Investments' and issued new series of 'Specials' from time to time and at certain intervals, announcing that it would pay a return of a specific and agreed percentage of 25, 40, 60, 75 and 100 per cent. During the years of 1920, 1921 and 1922 the said Leslie Harrington delivered as evidence of his indebtedness to the alleged investors his promissory note for the amount received and including the profit that the investor was to receive and six per cent additional, and in some cases a temporary receipt which would be converted later for his personal note. After September, 1921, the said Leslie Harrington issued notes under the same general scheme, but upon a printed form of note, which provided a deposit of collateral as security, the said collateral being stocked principally in the U. S. Novaculite Company and later in the American Novaculite Company, and said stock was to become the property of the alleged investor if the note to which it was collateral was not paid within ten days after it was due. No stock of either of the Novaculite Companies were delivered to anyone except $75,000.00 of alleged par value as part purchase of the' alleged Novaculite land. He delivered the same kind of note with the same kind of collateral up to February, 1922. All notes were payable at Harrington's office at Chicago.

More than 2,100 claimants filed their claims against the bankrupt estate of the said Leslie Harrington based upon the different forms of notes described above aggregating more than One Million Six Hundred Thousand Dollars. The dates of said notes extended from December, 1920, to February, 1922, both inclusive, and many of the later dated notes were in fact and are renewals of other promissory notes of a similar character executed and delivered by said Harrington upon prior dates and, otherwise unpaid. At no time during the period of time above mentioned did the

said Harrington ever have money or property out of which he could pay his said indebtedness evidenced by multiplicity of notes except from sums received from other alleged investors upon similar schemes. The said Leslie Harrington had no other business or income from any other source during the above mentioned time.

The said Harrington never intended to and never did invest any part of said money in any legitimate stock, bonds, and like investments, nor did he in good faith deposit the money in any bank or trust company, but put the actual money received in safety deposit boxes or carried it on his person and at no time was any part of money available to pay his creditors or its whereabouts known.

The said Leslie Harrington and certain of his associates were indicted by the Grand Jury of Cook County in the State of Illinois, sitting at Chicago in the months of February and October, 1922, for conspiracy and for confidence game and thereafter they were placed on trial in the Circuit Court of Cook County, Illinois, at Chicago and were found guilty.

On or about January 13th, 1922, the said Harrington and others were duly sentenced for operating a confidence game based upon the said operations of said schemes and enterprises as herein before set forth, and the said Harrington is now serving a term of one to ten years in the State Penitentiary at Joliet, Illinois.

Leslie Harrington never intended to, nor did he at any time invest the money so received by him from said creditors for their use and benefit, nor did he ever intend to repay them the money received from them. All of these acts and doings as hereinbefore set forth were to cheat and defraud each and every one of the said claimants, and his acts extended from December, 1920, to the 10th day of

February, 1922, and by means of said fraudulent schemes, devices and enterprises he received many hundreds of thousands of dollars from more than two thousand dupes or claimants and creditors of his bankrupt estate.

Leslie Harrington and Harriet Hyer Harrington were married at Rockford, Illinois, in September 1916, after having lived together under an alleged marriage contract for ten years or more. They lived in East 46th Street, Chicago, Illinois, and 5739 South Michigan Avenue, Chicago, Illinois, which residences were leased and rent paid by Leslie Harrington. Harrington and his wife maintained their legal and family residence as above until the 1st of November, 1921, about which time they stored their household goods. Up to that date they lived together as husband and wife in the same manner as they have always been living since their marriage in 1916. So far as the public knew or their acquaintances could observe at no time was there any disturbance in their domestic relations until shortly before the defendant, Harriet Hyer Harrington, filed a petition for divorce in Circuit Court in the 15th Judicial Court of Palm Beach County, Florida, in July, 1923, in which proceedings the said Leslie Harrington voluntarily appeared. Afterwards the said Harriet Hyer Harrington secured a divorce by default and collusion with and from Leslie Harrington upon the grounds of non-support for two years. During their pretended separation, friendly relations existed between them at all times and they visited each other at hotels and various places and in the home of Harriet Hyer Harrington in Palm Beach, Florida, and elsewhere and were in communication with each other at various times and places.

On May 10th, 1921, a pretended separation agreement was drawn between Leslie Harrington and his wife Harriet Hyer Harrington which was not signed nor delivered until the

latter part of May, 1921. The instrument was executed and delivered by Leslie Harrington to his wife Harriet Hyer Harrington at Chicago, Illinois, and while said parties were in fact residing and living together as husband and wife. They continued so to live together as husband and wife for a period of time after execution and delivery of said instrument. The said instrument was not acknowledged before any officer authorized to take acknowledgments in the State of Illinois and has never been recorded in the Recorders' office in Cook County, Illinois, as by law required. The instrument purported to convey to Harriet Hyer Harrington $75,000.00 and certain household furniture and property and assets of Leslie Harrington, bankrupt. Under the laws of the State of Illinois, said instrument was and is void as to the creditors of said Leslie Harrington, bankrupt, and the transfer of property to Harriet Hyer Harrington was without consideration and contrary to public policy and a cheat and fraud on the creditors of Leslie Harrington, bankrupt. The alleged contract is as follows:

### AGREEMENT.

This agreement entered into this tenth day of May, Nineteen Twenty-one, by and between Leslie Harrington and Harriet Hyer Harrington, husband and wife, both of Chicago, Illinois, Cook County.

WHEREAS, the above mentioned Harriet Hyer Harrington and Leslie Harrington have not lived together as husband and wife for some time past and as it is the understanding between the parties above mentioned that the said parties shall continue to live separate and apart.

It is further agreed by and between the parties hereto that the said parties shall live separate and apart and it is further understood and agreed that the said Harriet Hyer

Harrington shall have as her sole individual and separate property, her jewelry, household furniture and all moneys which heretofore have been given her or placed in name or with her, or saved by her from moneys given her for household expenses or otherwise, and in addition thereto the said Leslie Harrington agrees to give and gives herewith receipt whereof is hereby acknowledged by the said Harriet Hyer Harrington the sum of Seventy Five Thousand Dollars ($75,000.00) in cash, which, together with said other moneys, household goods, furniture and jewelry herein mentioned shall become and is the absolute property of said Harriet Hyer Harrington, free and clear of any and all right of said Leslie Harrington by virtue of any right, claim or demand including that of dower, or otherwise as the husband of said Harriet Hyer Harrington.

Said Leslie Harrington further agrees to take out a life insurance policy to the value of Twenty Thousand Dollars ($20,000.00) for Harriet Hyer Harrington as beneficiary and agrees not to change the beneficiary at any time.

It is further understood and agreed that said jewelry, household furniture and said moneys shall be in full settlement of all claims of every kind and character which the said Harriet Hyer Harrington may or might have against the said Leslie Harrington.

It is further understood and agreed that the said Harriet Hyer Harrington has not filed any bill for separate maintenance at any time and shall not file any bill for divorce within a period of six months from the day and date of this agreement.

IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals this 19th day of May, 1921.

Leslie Harrington (Seal)<br>Harriet Harrington (Seal)

The entire sum of $75,000.00 so paid to Harriet Hyer

Harrington by Leslie Harrington was procured by him from the dupes and creditors of this bankrupt estate by means of his fraudulent schemes, devices and enterprises heretofore set out.

Harriet Hyer Harrington, one of the defendants and wife of Leslie Harrington, is a bright and intelligent woman, well versed in business affairs and capable of having direct knowledge and did know all about the fraudulent schemes and about the affairs of her said husband. She knew that this business and the very nature of it was fraudulent and false, and that he was receiving large sums of money during 1920 and 1921, prior to the date and execution of the alleged separation agreement. She demanded One Hundred Thousand Dollars ($100,000.00) from the said Leslie Harrington and did shortly thereafter receive $75,000.00 in cash from the said Leslie Harrington about the last of May, 1921, and the said sum so paid was never at any time nor thereafter deposited in any legitimate bank on which she did draw at any time a check. The said Harriet Hyer Harrington has no business of any kind and no other source of income except from her husband Leslie Harrington.

It is provided by the laws of the State of Illinois and contained in Hurd's revised statutes of the State of Illinois, Chap. 68, paragraph 9, to-wit:

Hurd's revised statutes of the State of Illinois, Chap. 68, paragraph 9, to-wit:

WIFE MAY OWN, CONVEY, ETC., REAL AND PERSONAL PROPERTY, ETC., Par. 9. A married woman may own in her own right real and personal property obtained by descent, gift or purchase, and manage, sell and convey the same to the same extent and in the same manner that the

husband can property belonging to him. PRO-
VIDED, that where husband and wife are living
together no transfer or conveyance of goods and
chattels between such husband and wife shall be
valid as against the rights and interests of any
third person, unless such transfer or conveyance
be in writing, and be acknowledged and recorded
in the same manner as chattel mortgages are re-
corded by the laws of this state, in cases where
the possession is to remain with the mortgagor.

The separation agreement should have been recorded in
the public records of Cook County, Illinois, and is not there
recorded nor anywhere else recorded and is not witnessed
nor acknowledged according to the law of the State of
Illinois as by statutes of such state made and provided.

At the time that Harrington paid the $75,000.00 to his
wife, Harriet Hyer Harrington, he was indebted to his
various dupes and creditors in the aggregate far in excess
of $75,000.00 for money, funds and credits that he had
obtained by the use of his confidence game and fraudulent
enterprises. At that time Leslie Harrington was insolvent,
all of which was well known to Harriet Hyer Harrington
when she received such sum.

The said dupes and creditors to whom he was indebted
at the time he made said payment to Harriet Hyer Harring-
ton have never been paid. Their claims have been filed and
allowed as required by law and after exhausting all the
assets of said bankrupt estate in the payment of such claims
the balance remaining due and unpaid will be largely in
excess of Seventy-five Thousand Dollars; at the time Leslie
Harrington paid the $75,000.00 to Harriet Hyer Harring-
ton he was insolvent and known by her to be insolvent and
creditors to whom he was indebted at that time have pre-
sented their claims against said bankrupt estate which have

4—Vol. 92.

been filed and allowed as required by law; and after exhausting all assets of said bankrupt estate in payment of said claims the balance due and unpaid will be largely in excess of $75,000.00.

Said sum of $75,000.00 so paid to Harriet Harrington was the identical money and not other or different money which he had procured from various dupes or creditors by means of his confidence game and various fraudulent enterprises. This was well known to Harriet Hyer Harrington at the time she received the same and none of said dupes and creditors from whom said actual money so paid to Harriet Harrington was obtained have been repaid, and all of them have filed their claims against said bankrupt estate, for said sums of money they so delivered to Leslie Harrington and which he so delivered to Harriet Harrington and all of said claims have been allowed against said bankrupt estate as required by law. After exhausting all assets of said bankrupt estate in the payment of said claims the balance due and unpaid will be largely in excess of $75,000.00.

At the time of the payment of said $75,000.00 to said Harriet Harrington, Leslie Harrington was and still is indebted to various dupes and creditors for money, funds and credits that he had theretofore obtained from them by means of the said confidence game and fraudulent enterprises far in excess of $75,000.00 whose claims have been filed against said bankrupt estate and allowed as required by law; the payment of said sums to the said Harriet Harrington was made, contrived and devised by Leslie Harrington of fraud, covin, collusion and guile to the end, purpose and intent to delay, hinder and defraud said creditors of their just and lawful debts, accounts and demands which were then due and owing to said dupes and creditors and are still due and owing, and which have been duly filed and allowed against the said bankrupt estate as aforesaid; after exhausting all assets of said bankrupt estate in the pay-

ment of said claims the balance remaining due and unpaid thereon is largely in excess of $75,000.00.

At the time Leslie Harrington paid the sum of $75,000.00 to Harriet Harrington he was running and operating his said confiidence game and fraudulent schemes and enterprises and believed and expected that he would obtain large sums of money from dupes from whom he never intended to refund such money, whom it was his intention to swindle and defruad; and it was part of his plan and scheme in order to swindle and defraud such dupes, that the sum of $75,000.00 to be placed beyond their reach by delivering the same to his wife, who could secrete the same; that he did pay said sum of $75,000.00 to his wife Harriet Harrington as part of and pursuant to such plan and scheme and said payment was made and said plan and scheme to make said payment was contrived and devised by said Leslie Harrington of fraud, collusion and guile to the end, purpose and intent to delay, hinder and defraud all such dupes from whom he might thereafter obtain money from funds or credits pursuant to his confidence game and fraudulent enterprises, of their just and lawful debts, all of which was well known to the said Harriet Hyer Harrington, and the said Leslie Harrington after making said payment to her did, according to his belief and expectation, obtain large sums of money, funds and credits, largely in excess of $75,000.00 from dupes and creditors pursuant to said confidence game and fraudulent enterprises which have never been repaid, and whose claims against said bankrupt estate for such money, funds and credits, so obtained have been duly filed and allowed against the bankrupt estate as required by law and after exhausting all assets of said bankrupt estate in payment of such claims the balance remaining due and unpaid thereon will be largely in excess of $75,000.00.

The said Harriet Hyer Harrington, one of the defendants, used said money so obtained as aforesaid in the purchase of and building improvements on the following described lands, situate in Palm Beach County, Florida, to-wit:

Lots 416 and 418 in Poinciana Park, Second Addition, according to the plat thereof on file in the office of the Clerk of the Circuit Court in and for Palm Beach County, Florida, otherwise described as 'Villa Chico,' 274 Sea Spray Avenue, Palm Beach, Florida, together with all improvements thereon, including garage and outbuildings and contents thereof; also

Lots 1, 2 and 3, Eucalyptus Park, according to the plat thereof on file in the office of the Clerk of the Circuit Court in and for Palm Beach County, Florida, together with all improvements thereon and all the household furniture and furnishings therein and including the garage and outbuildings and contents thereof; also

Lots 1, 2, 3, 4, 5, 6, 7 and 8 in Block 9, Royal Park Addition to Palm Beach, according to the plat thereof on file with the Clerk of the Circuit Court in and for Palm Beach County, Florida; also

Lots 24 and —— in Block 3 and Lots 9 and 10 in Block 9, Gruber-Carlberg Addition to the City of West Palm Beach, Florida, according to the plat thereof on file in the office of the Clerk of the Circuit Court in and for Palm Beach County, Florida.

The above described land was purchased with and the improvements were paid for out of the said $75,000.00 paid as aforesaid by the said Leslie Harrington and no other or different money was used by the said Harriet Hyer Harrington in the purchase of said land and the erection of the improvements thereon.

Said Harriet Hyer Harrington did not take title to said

land in her own name, but had the title taken in the name of her mother, Ellen Hyer, one of the defendants, and such action was in furtherance of the scheme to hinder, delay and defraud the creditors of the said Leslie Harrington whose claims are now due, owing and unpaid and had been duly proven and allowed against said bankrupt estate as aforesaid.

Ellen Hyer, one of the defendants, did not pay any of the purchase price of said land or pay for the improvements thereon and did not have money whatever invested therein and has no interest except to hold it for her daughter, Harriet Hyer Harrington.

In addition to the $75,000.00 so paid by Leslie Harrington to Harriet Hyer Harrington, he also paid her $15,000.00 additional which was also money which he procured from the dupes and creditors pursuant to his confidence game and fraudulent enterprises and the said creditors from whom said $15,000.00 was obtained have duly proven their claim against said bankrupt estate in manner and form as required by law. The payment of said $15,000.00 to said Harriet Harrington was made pursuant to a plan and scheme and was executed, contrived and devised of fraud, covin, collusion and guile to the end, purpose, and intent to delay, hinder and defraud said creditors whose claims have been proved and allowed as aforesaid. After exhausting all assets in the hands of said Trustee in the payment of such claims, there will be and remain a balance due and unpaid thereon largely in excess of $500,000.00.

It is alleged on information and belief that Leslie Harrington has transferred to the said Harriet Hyer Harrington jewelry, furniture and household goods of high value, all of which he purchased with money obtained from said dupes and creditors pursuant to said confidence game and

fraudulent schemes, whose claims have been allowed as aforesaid and he delivered the said jewelry, furniture and household goods to said Harriet Harrington pursuant to a scheme and plan devised by covin, collusion and fraud to the end, purpose and intent to hinder, delay and defraud said creditors.

It is alleged on information and belief that the defendants, First American Bank & Trust Co., Farmers Bank & Trust Co., and Citizens Bank and First Bank & Trust Co., have each of them some portion or portions of said money or jewelry so given to said Harriet Hyer Harrington as aforesaid.

The prayer of the bill is as follows:

The premises considered, your orator prays as follows: That an account may be had and taken by and under the direction of this Honorable Court; that the Court ascertain and determine the amount of money and value of jewelry, household goods and furniture paid over and given to said Harriet Hyer Harrington as aforesaid; that the defendant Hyer Harrington may be ordered to return said goods, jewelry and furniture and to pay over said money by a short day to be fixed by the Court for that purpose; that the above described land may be impressed with a trust to the extent that it was paid for and improved with the money received from said Leslie Harrington, and upon the failure and refusal of the said Harriet Harrington to return said jewelry, furniture and household goods and to pay over said money, then in that case said lands and any and all other property belonging to the defendant, Harriet Harrington, may be sold to satisfy the same.

And may it please the Court to appoint a Receiver in said cause to take charge of all the real and personal property of the defendant, Harriet Harrington, and to collect the rents on all her real estate and to keep and preserve

such property until the final determination of this Court and subject to the orders of this Court.

And may it please the Court to grant unto your orator such other and further relief in the premises as your orator's case may require and as to your Honor may seem meet and just.

And may it please the Court to grant unto your orator the State's writ of subpoena directed to the defendant, Leslie Harrington and his wife Harriet Hyer Harrington and Ellen Hyer, the First National Bank & Trust Company, the Farmers Bank & Trust Company, the Citizens Bank of West Palm Beach, and the First Bank & Trust Company of Palm Beach commanding them and each of them on a day certain and under a penalty therein stated to be and appear before this Court and then and there answer this second amended bill of complaint, but not under oath, the answer under oath being hereby waived, and require them to stand to, abide by and do and perform such order in the premises as your Honor shall render and as to the Court shall seem meet and just.''

To the second amended bill of complaint demurrer was filed as follows:

''Comes now Harriet Hyer Harrington, Leslie Harrington and Ellen Hyer, severally, by their attorneys, Kay, Adams, & Ragland, and severally demur to the complainant's further amended bill of complaint, because the same is bad in substance.

*Matters of Law to Be Argued and to Be Applied to said Further Amended Bill of Complaint on Behalf of Demurrants Severally.*

1. Said bill states no equity in favor of the complainant.

2. It appears that the theory of said bill is to charge specific properties with a constructive trust for certain

moneys alleged to have fraudulently been obtained from certain creditors, but said bill by its allegations is wholly insufficient for such purpose, or for any other purpose.

3.  Said bill of complaint shows that the alleged creditors whom the complainant represents have estopped themselves to assert that any trust has arisen in the alleged properties in their favor by reason of money paid by them to Leslie Harrington, bankrupt.

4.  It appears from said bill that the alleged claims filed and allowed in the bankruptcy court are based upon certain alleged notes given by the bankrupt, which notes, however, do not represent the actual moneys loaned or invested by the alleged 'investors', but represent the amounts which the alleged bankrupt promised to pay to the alleged investors; from which it follows that each and every of said alleged creditors have affirmed the validity of said notes and the transaction severally represented by them, and they are now estopped to assert and the trustee representing them is estopped to assert, that the transactions represented by such notes are invalid on account of fraud, or otherwise.

5.  The alleged allowance of the 2100 or more claims filed in the bankruptcy court, based upon the alleged promissory notes, is the same in law as 2100 judgments upon the contracts evidenced by such notes, and the procuring of such judgments upon the contracts evidenced by such notes, and the procuring of such judgments by the alleged creditors constitutes a binding election upon their part to claim as general creditors of said estate; from which it follows that they and the trustee representing them are now estopped to assert that any of said creditors is entitled to charge the properties purchased under the circumstances alleged in said bill with a lien in their favor on the theory of a constructive trust, or otherwise.

5½. Said bill of complaint endeavors to claim a trust against specific properties, not for moneys actually advanced by the 'investors' to the bankrupt, but for the aggregate sum of money represented by what is now alleged to have been fraudulent promissory notes outstanding at the time the alleged $75,000.00 was paid to the defendant, Harriet Hyer Harrington.

6. Said bill wholly fails to name or identify the alleged 'investors' or the amounts by them severally invested, or the dates of their alleged investments, who would be entitled to reach or charge any piece or pieces of property described in the bill of complaint.

7. Said bill wholly fails to trace any particular investment by any particular investor into the hands of Leslie Harrington, and thence into the hands of Harriet Harrington, and thence into any particular piece of property.

8. The alleged 'investors' have by filing and procuring the allowance of their several alleged claims in the bankruptcy court, based upon the alleged promissory notes, estopped themselves not only to charge that the several transactions represented by such promissory notes were fraudulent, but as well have estopped themselves to assert that the defendant Harriet Harrington had knowledge that such several transactions were fraudulent.

9. The alleged creditors of the bankrupt who are alleged to have been 'investors' with the bankrupt, by proving and procuring the allowance of their alleged claims, based upon the alleged promissory notes, have effectually precluded themselves, as well as the trustee representing them, from attempting to follow the funds actually invested by them with the bankrupt into the hands of the defendant Harriet Harrington, and thence into specific properties.

10.  Said bill of complaint shows that the alleged 'investors' with Leslie Harrington voluntarily made themselves parties to a gambling, confidence or other illegal transaction, prohibited by the laws of the State of Illinois, and neither they nor the Trustees in Bankruptcy can invoke the aid of a Court of equity to relieve them from their participation in such illegal transaction, and especially will a Court of equity not award them any part of the profit which they expect to derive therefrom.

11.  Said bill of complaint shows that the Trustee in Bankruptcy on behalf of the alleged 'Investors' is endeavoring to invoke the aid of a court of equity to collect out of the properties purchased by the defendant Harriet Harrington, not only the moneys invested with the Bankrupt, but as well the profits which the alleged 'Investors' expected to derive out of a transaction constituting a confidence game, and prohibited by the laws of the State of Illinois, such 'Investors' either knowing or being chargeable with knowledge that they could not lawfully derive any such profit as was promised by the alleged promissory notes, and which was not derived by the bankrupt.

12.  Said bill of complaint shows that the alleged 'Investors' and the trustee undertaking to represent them in this suit have come into a court of equity with unclean hands, and are admitted participants in the violation of the criminal law of the State of Illinois.

13. Said bill of complaint shows that each of the alleged 'Investors' now claiming as creditors in bankruptcy became subscribers to the capital stock of a corporation, and that by this suit they are attempting to repudiate the relation of subscribers to such stock and to avoid the liability created thereby in favor of the creditors of such corporation.

14.  It was too late after the alleged insolvency of the United States Novaculite Company of the American Novaculite Company for the alleged 'Investors' to change their minds and repudiate their subscription to the stock in the said Companies, or one of them, as evidenced by the alleged promissory notes, and by procuring allowance of their several claims based upon the alleged notes they and their trustee are now estopped from asserting that the alleged notes were not valid and binding obligations.

15.  Said bill is repugnant and inconsistent in that it avers in one place that the alleged claims of the alleged 'Investors' based upon the alleged promissory notes were duly proven and allowed in the bankruptcy court, whereas in other places in said bill it appears that said notes so proven are from twenty-five to fifty percent thereon represented by profits which said 'investors' expected to receive from the said Leslie Harrington.

16.  Said bill is repugnant and inconsistent in that the complainant as Trustee is endeavoring by said bill to obtain a preference and security for a part of the alleged 'investors,' to-wit: those who are alleged to have been such prior to May, 1921, to share fully as general creditors of the bankrupt estate, all to the detriment of those alleged to have become 'Investors' with the bankrupt subsequent to that time.

17.  Said bill of complaint attempts to show that the $75,000.00 and the $15,000.00 alleged to have been paid to the bankrupt's wife was a trust fund in favor of the alleged 'Investor' who had become such up to the time of such payment, but who are alleged not to have been repaid; whereas if that be so subsequent 'investors' could have no claim or right to such fund, and hence the receipt of such moneys by the wife of the bankrupt caused such subse-

quent creditors no harm whatsoever and they were not defrauded thereby.

18.   The statute of the State of Illinois quoted in paragraph 11 of said bill is not applicable to such agreements as the separate maintenance agreement quoted in paragraph 9 of said bill, from which it follows that said bill fails to show the invalidity of said agreement or to show that the consideration therein recited were not bona fide.

19.   The bill of complaint shows that the complainant has no standing to attack, collaterally or otherwise, the validity of the decree of divorce granted to the defendant, Harriet Harrington.

20.   The bill of complaint shows that the complainant has no standing in equity to attack the validity of the separation agreement quoted in said bill of complaint.

21.   The alleged action of the Criminal Court of the State of Illinois is not binding upon this Court in Chancery.

(a)   For the reason that the parties were not the same;

(b)   The cause of action was not the same;

(c)   The complainant and/or the alleged 'Investors' whom he represents have made a binding election in the bankruptcy court by asserting the validity of the promissory notes given by the bankrupt, and by prosuting an allowance of their alleged claims based upon the amounts promised in said notes severally.

22.   If any such cause of action ever existed in favor of the alleged 'Investors,' or any of them as the complainant attempts to describe in the bill of complaint, it nevertheless appears by said bill of complaint that the alleged 'Investors' and/or the trustee is guilty of laches in seeking the relief demanded by said bill of complaint.''

Order on the demurrer was as follows:

''This cause having come to be heard upon the several

demurrers of Harriet Hyer Harrington, Leslie Harrington and Ellen Hyer to the second amended bill of complaint, and the same having been duly argued by counsel for the respective parties, and duly considered by the Court, thereupon,

It is ordered, adjudged and decreed, that the demurrer be and the same is hereby sustained and bill dismissed, with costs including compensation of the receiver and his attorneys, heretofore fixed by the Court, taxed against the complainant, for which let execution lie, and

It is further ordered, adjudged, and decreed that the Clerk of the Court pay over to defendant Harriet Hyer Harrington, or her attorneys, such sums as may have been or will be paid into Court by the Receiver; and,

It appearing to the Court that the defendant, Harriet Hyer Harrington, filed an answer seeking affirmative relief, but that no reply has been filed, neither has any decree pro confesso been entered thereon, thereupon

It is ordered, adjudged and decreed that this Court retain jurisdiction of said cause for the purpose of settling the equities, if any, set forth in said answer.

Done and Ordered at Chambers this 2nd day of December, A. D. 1925.''

An order upon the final report of the Receiver was also made as follows:

''This cause having heretofore come on to be heard upon the Final Report and supplementary Final Report of the Receiver, Harry Hauck, and the exceptions of the Defendant Harriet Hyer Harrington to said Final Report, and the same having been argued by counsel for the respective parties, after due notice, and after affidavits having been submitted, and the Court being advised in the premises, it is upon consideration thereof:

ORDERED, ADJUDGED, AND DECREED that the Exceptions to the Final Report of the Receiver be and the

same are hereby overruled and the Final Report and supplementary Final Report of the Receiver be and the same are hereby approved and confirmed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the total compensation of the Receiver for his services be and the same is hereby set and allowed in the sum of Twenty-five Hundred Dollars ($2500.00), and the fees of counsel for Receiver are set and allowed in the sum of Fifteen Hundred Dollars ($1,500.00), from which shall be subtracted the sums heretofore allowed and paid the Receiver and his counsel, leaving a balance of Seventeen Hundred and Fifty Dollars ($1750.00) due the receiver, and the sum of One Thousand Dollars ($1000.00) due counsel for the Receiver.

IT IS FURTHER ORDERED that all sums of money now in the hands of the Receiver be delivered to Fred E. Fenno, Clerk of this Court, to be held in the registry of the Court until further order.

Done and ordered in Chambers at West Palm Beach, Florida, this 28th day of November, A. D. 1925.''

Appeal was taken from the order of Court sustaining the demurrer and dismissing the bill at the cost of the complainant.

The original Bill of Complaint contained a prayer for injunction and for the appointment of a receiver. The prayer was granted. Then Complainant moved to amend the Bill to make it include property not therein described. Harriet Hyer Harrington opposed the motion and moved to dissolve the orders of injunction and appointing a receiver. Upon hearing the motion to dissolve was granted and the Bill dismissed with leave to amend. The complainant amended the Bill. Demurrer was filed and sustained. The second amended Bill as hereinbefore outlined was then filed with the result as stated.

The orders of the Chancellor dismissing the original bill, dissolving the injunction and vacating the appointment of a receiver and sustaining the demurrer to the amended Bill of Complaint are each assigned as error.

Upon inspection of the original Bill of Complaint we find that it did not constitute sufficient basis for the granting of the order of injunction or for the order appointing a receiver.

The demurrer to the second amended Bill of Complaint admits all the material allegations well pleaded therein. These allegations which the demurrer admits to be true lead to the conclusion that the equitable title to the property described in the Bill of Complaint was in the defendant Leslie Harrington. That the legal title is in Ellen Hyer, as trustee of Leslie Harrington and that the Trustee in Bankruptcy has succeeded to the equitable title of the bankrupt Leslie Harrington as a part of the general assets of the bankrupt's estate and that he is entitled to have the legal title to such property so conveyed to him by and under order of Court, that he may dispose of the same for the benefit of the bankrupt's estate.

It appears to have been the contention of the counsel representing the appellees before the Chancellor and to be their contention before this Court that the complainant is estopped from proceeding to convert the property described in the bill of complaint to assets in the hands of the Trustee upon the theory that the Trustee is here endeavoring to impress upon this property a trust in favor of creditors upon the ground that the money used to pay for the property was obtained from them by fraud. It also appears that the Chancellor must have been impressed with this view of the case. If this were the case then certainly the Bill would not lie on behalf of the creditors, because they have elected their remedy and the bill shows

that they have proven their claims in a Court of Bankruptcy which is equivalent to taking a judgment against the bankrupt upon an alleged, valid and binding obligation; and they would after pursuing such course be estopped from the recovering of specific property upon the allegation that such property was procured with their identical money obtained from them by fraud.

This, however, is not the case made by the Bill of Complaint.

The case made by the Bill of Complaint is that Harrington, being engaged in a hazardous enterprise and knowing that his creditors would fall upon him demanding the payment of his obligations, with the intent to defraud, hinder and obstruct his creditors in the collection of claims from him, attempted by fraud and deceit to conceal a part of his assets and that as a means to this end he pretended to convey certain of his assets to Mrs. Harrington; Mrs. Harrington assisting him in carrying out his fraudulent purpose took such certain property described in the Bill of Complaint and had the title made in the name of her mother. The whole transaction is alleged to have been fraud against creditors, and the Trustee in Bankruptcy is here proceeding in an effort to have this property (the legal title to which is alleged to be in the bankrupt) conveyed to him as a part of the assets of the bankrupt's estate that it may be marshaled with and as assets for the benefit of the creditors.

The allegations of the bill with reference to the fraudulent intent, purposes and transactions of the bankrupt toward and with his creditors are pertinent for the purpose of showing the probability of fraud in the act of transferring a part of his estate to Mrs. Harrington for the alleged purpose of defrauding his creditors.

A trustee in bankruptcy appointed under the provision

of the Act of Congress to Establish a Uniform System of Bankruptcy is vested with full authority to maintain suits in equity to set aside fraudulent conveyances made by the bankrupt. Beasley v. Coggins, 48 Fla. 215, 37 South. Rep. 213, and cases there cited.

In an action by a Trustee in Bankruptcy it will be presumed that his appointment is regular and that he has complied with all requirements of the Federal Statute and is qualified to act. Breckons v. Snyder, 211 P. State Report, 177, in which case the Court speaking through Mr. Justice Fell say:

"A petition in bankruptcy was filed by the creditors of W. D. Chilelewsky on March 14, 1902, and was so proceed with that he was adjudged a bankrupt on April 29, 1902. This action was brought by the trustee of his estate to recover of the defendant $5,000 transferred to him by the bankrupt on February 17, 1902. The declaration contained two counts. In the first it was alleged that the money had been given to the defendant without any consideration and with the intent to defraud the bankrupt's creditors and for this purpose it was received and retained by the defendant; in the second it was alleged that the money was paid after insolvency and within four months of the filing of the petition in bankruptcy for the purpose of giving the defendant a preference over other creditors. The second count was withdrawn at the trial, and the case went to the jury on the issue raised by the first, the plaintiff's contention being that the money had been placed by the bankrupt in the defendant's hands for concealment, and the defendant's that he had received it in discharge of a debt due him by the bankrupt. These contentions were submitted to the jury with instruction that if the transaction was the payment of a debt due the defendant, their verdict should be for him; That if they disbelieved

his testimony and found that the bankrupt did not owe him the money, their verdict should be for the plaintiff.

In support of a number of assignments of error which raise the question in different forms it is argued that it was incumbent on the plaintiff to show that there were unsatisfied creditors at the time of the transfer, at the time the suit was brought and at the time of the trial for the reason that if there were no creditors when the transfer was made, there was no one to be defrauded by it, and if there were none afterwards there was not one in whose interest the trustee could maintain the action. The first ground of objection would not be without merit if a recovery had been sought because of a preferential transfer within the time prohibited by law. But the second count was withdrawn and the only issue at the trial was whether a debt had existed and had been paid. No other right to retain the money was set up. If it had not been given to the defendant in discharge of a debt, it was the bankrupt's money in the defendant's hands, which the trustee could recover for creditors. The adjudication was evidence of the bankrupt's insolvency at its date, and it was not necessary to prove insolvency at the trial.''

The allegations of the bill to the effect that the trustee had marshaled assets not exceeding in value the sum of $25,000.00 and that the claims filed and allowed amount to more than Eight Hundred Thousand Dollars are sufficient to constitute a basis upon which the trustee may proceed to recover property conveyed in fraud of creditors. Mueller v. Bruss et al., 112 Wis. 406, 88 N. W. 229.

Proof of circumstances from the existence of which fraud may be inferred or presumed is admissible and the alleging of such circumstances when reasonably connected with the fraudulent act charged is proper where fraud is

the basis of an action to recover property. Schumacker v. Bell, 164, Ill. 181, 45 N. E. 428; Beasley v. Coggins, *supra.*

In Lander v. Ziebr, 150 Mo. 403, 51 S. W. 742, the Court say:

''What are the circumstances which would justify holding a conveyance fraudulent as to subsequent creditors? Proof of prior debts, insolvency of the debtor at the time of the conveyance or, though solvent, rendering himself insolvent by the conveyance he makes or the design or purpose to hinder, delay or defraud those to whom he is about to become indebted, are some of the marked indicia of fraud. In a word, an intent to contract debts to avoid payments of such debts by the conveyance  *  *  *  proving payment of prior debts amounts to nothing if it appears that the debtor is acquiring other debts.''

This doctrine is enunciated by this Court in the case of Beasley v. Coggins, *supra.*

This Court in the case of Kahn et al. v. Weinlander, 39 Fla. 210, 22 South. Rep. 653, held:

''In a contest between creditors of an insolvent debtor and the latter's wife over real estate purchased in her name during the husband's indebtedness, there must be clear proof that the purchase was made with the wife's separate funds, otherwise the presumption is that it was through means furnished by her husband.''

We consider the holding in that case applicable to the case at bar. The bill alleges that there was a pretended settlement made between Harrington and his wife and that a written contract was executed by Harrington assigning certain property to his wife but alleges that such pretended contract was void and a fraud as to creditors. Section 9, Chapter 68, Revised Statutes of Illinois, is quoted in the bill and it is alleged that this Statute was not complied with; it probably makes no material difference

whether that statute was complied with or not except, that non-compliance with the statute may be considered as a further evidence of fraud in the transaction. The Supreme Court of Illinois has construed this statute in the case of Wineberger v. Bliss, 53 Ill. Appellate Court Reports 112, in which case the Court say:

"The statute declares that 'where husband and wife shall be living together, no transfer or conveyance of goods and chattels between such husband and wife shall be valid as against the rights and interest of any third person, unless such transfer or conveyance be in writing, and be acknowledged and recorded in the same manner as chattel mortgages are required to be acknowledged and recorded by the laws of this State, in cases where the possession of the property is to remain with the mortgagor.' R. S., Ch. 68, Sec. 9.

"And where the mortgagor in such case is a resident of this State, the Statute requires the entry in the justice's docket, shall be substantially as follows: A. B. (name of mortgagor) to C. D. (name of mortgagee) mortgagor of (here insert description of the property as in the mortgage). Acknowledged this...... day of.........18....'

These statutes plainly make substantial compliance with these requirements essential to the validity of the instruments respectively mentioned. And they must be complied with in the order prescribed, which is not only prescribed, but natural and necessary. Manifestly, it would not be a compliance to have the instrument recorded before it is acknowledged, or acknowledged before it is executed. The justice of the peace is required not only to append to it his certificate of its acknowledgment, but also to make an entry in his docket, giving the names of the parties, the description of the property, and the fact and date of the acknowledgment; and the statute contemplates this entry as to be made at the time and as a part of the acknowledgment. Its

omission or postponement until the mortgage or bill has been filed for record is fatal to their validity. Koplin v. Anderson, 88 Ill. 120; People v. Hamilton, 17 App. 603. The same conclusion is implied in Harvey v. Dunn, 89 Ill. 585, and Schroder v. Keller, 84 Ill. 46, cited for appellant. For that reason the court below properly excluded the bill of sale offered in this case; and without that she could not lawfully recover.

"The position that payment for the property by her, in good faith, and actual possession taken before the executions against her husband came to the hands of appellee, would entitle her to hold it as as against these creditors, is not tenable; without a transfer or a conveyance valid under the statute she could acquire no title from her husband by such means that would be valid as against the rights or interest of 'any third person.' As against existing liens, of course, not even a statutory transfer or conveyance would avail her. The statute was intended for the protection of subsequent purchasers and incumbrancers."

In re Downing, 201 Federal Rep. 93, 119 C. C. A. 43, it is held: "The trustees is vested with all the rights, remedies and powers of a judgment creditor of the bankrupt having an execution returned unsatisfied, and if a transfer be in fraud of creditors, he may set it aside, have the specific real property sold and apply the proceeds to the payments of the debts proved against the bankrupt." See also McKeown v. Allen, 37 Fla. 49, 20 South. Rep. 556.

Where property is purchased by a debtor and the title is taken in the name of another to avoid creditors, the deed to the grantee for the property of the debtor can be set aside by then existing and by a subsequent creditor. Abramson v. Horner, et al., Court Appeals of Maryland, 80 Atl. 907, and cases there cited.

Mr. Wait in his Treatise on Fraudulent Conveyances, Third Edition, Section 100 says:

"PLACING PROPERTY BEYOND THE RISK OF NEW VENTURES OR SPECULATIONS. This brings us to the most important branch of the subject, viz., the effect of conveyances, gifts and settlements made to avoid the risks of losses likely to result from new business schemes. To illustrate, a baker who had been carrying on business for some years, being about to purchase a grocery business, which he intended to carry on together with his own trade, made a voluntary settlement of nearly the whole of his property upon his wife and children. He then purchased the grocery business and having lost money sold it, but continued in business as a baker. Three years after the settlement he filed a liquidation petition. The court held that independently of the question whether he was solvent at the date of the settlement, it was voidable as against the trustee in liquidation, under the Stat. 13 Eliz. c. 5, on the ground that it was evidently executed with the view of putting the settler's property out of the reach of his creditors in case he should fail in the speculation on which he about to enter, in carrying on a new business of which he knew nothing. If a settlement is made 'On the eve of a new business, and with a view of providing against the contingencies, it is as unavailing against new creditors as against old ones.' This same general principle was involved in Case v. Phelps, in the New York Court of Appeals. Woodruff, J., a judge of much learning and great vigor of mind, said: 'May a person about to engage in business which he believes may involve losses, with a view to entering upon such business, convey his property to his wife, voluntarily, without consideration, to secure it for the benefit of himself and family, in the event that such losses should occur? I cannot regard this question, as in

substance, other than the inquiry, may a man, for the purpose of preventing his future creditors from collecting their demands out of his property then owned, and *for the purpose* of casting upon them the hazards of his success, in the business in which he is about to engage, convey his property without consideration to his wife, in order to secure the benefit of it to himself and family, however disastrous such business may prove, and continue in the possession, not even putting the deeds upon record until after subsequent indebtedness arises?' The question of the validity of a gift or settlement, as to subsequent creditors, as we have said, turns upon the question as to whether it was made in contemplation of future debts, or to secure the debtor 'a retreat in the event of a probable pecuniary disaster in a hazardous business in which he proposed to embark.' To bring the transfer within this rule, 'it must be executed with the intention and design to defraud those who should thereafter become his creditors,' the debtor proposing to throw the hazards of the business in which he is about to engage upon others, instead of honestly holding his means subject to the chance of the adverse results incident to all business enterprises.''

The record shows that the Circuit Court of Palm Beach County, Florida, had jurisdiction of the parties and of the subject matter. For reasons stated we conclude that it appears that the second amended bill of complaint contains such allegations as would upon proof thereof being submitted, warrant the Court in granting the relief prayed for in the Bill of Complaint and that the order and the decree of the Chancellor from which this appeal is taken constituted error and the same should be Reversed. It is so ordered.

Reversed.

WHITFIELD, P. J., AND TERRELL, J., concur;

BROWN, C. J., AND ELLIS AND STRUM, J. J., concur in the opinion.

## On Rehearing.

PER CURIAM.—The opinion in this case is based upon the order of court sustaining a general demurrer to the second amended bill of complaint and dismissing the bill at the cost of the complainant.

Besides the special prayer contained in the bill of complaint there is a general prayer for such relief as the equities will warrant. The allegations of the bill show an equity for appropriate relief.

The demurrer admits the allegations of the bill which are well pleaded. This admission, however, is not binding where the demurrer shall have been overruled. The defendants could then by answer deny the allegations of the bill and set up such additional allegations as may be proper under the rules of pleading; whereupon the plaintiff would be required to prove the material allegations of the bill of complaint which shall not have been admitted by the answer.

A court of chancery having jurisdiction for one purpose will retain the bill as to all other matters germane and necessary to the attainment of justice between the parties. Sommers v. Apalachicola N. R. Co., 75 Fla. 159, 78 South. Rep. 25.

Motion for rehearing is denied.

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., concur.

BROWN, C. J., AND ELLIS AND STRUM, J. J., concur in the opinion.